UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
KENNETH MARK BURTON as Administrator of the
Estate of FRANKLIN RAMOS SANCHEZ, MADGA
LILIANA MARTINEZ ACOSTA, Individually and
as m/n/g of F.N.R.M., an Infant, and FRANCY
TATIANA RAMOS MARTINEZ,

                             Plaintiffs,

              -v-

UNITED STATES OF AMERICA; ANTHONY
BUSSANICH, M.D., ROBERT BEAUDOUIN, M.D.,
TUNESIA MITCHELL, PA-C, YSMAEL JOAQUIN,
MLP, JOHN DOE, M.D., OPERATIONAL LT.
SHIVERS, BOP JOHN DOE SUPERVISOR 1, BOP
JOHN DOE SUPERVISOR 2, and JOHN/JANE DOES
Nos. 1-10,

                             Defendants.
-------------------------------------------------------------------x

**COMPLAINT AND DEMAND
FOR A JURY TRIAL**

**INDEX NO.**

**ECF CASE**

       Plaintiffs KENNETH MARK BURTON, as Administrator of the Estate of FRANKLIN

RAMOS SANCHEZ, MADGA LILIANA MARTINEZ ACOSTA, Individually and as the

mother and natural guardian of F.N.R.M., an Infant, and FRANCY TATIANA RAMOS

MARTINEZ, through their attorneys, GIDEON ORION OLIVER and ELENA L. COHEN, as

and for their Complaint in this matter, do hereby state and allege:

### PRELIMINARY STATEMENT

       1.     In March of 2015, employees of the United States Bureau of Prisons ("BOP"),

acting under color of law, failed to provide adequate medical care to Plaintiff's decedent,

FRANKLIN RAMOS SANCHEZ, while Mr. SANCHEZ was incarcerated at the Metropolitan

Correctional Center ("MCC"), in the custody of the BOP.

2.      As a result of Defendants' failure to provide Mr. SANCHEZ with adequate medical treatment, Plaintiffs' decedent, FRANKLIN RAMOS SANCHEZ, was injured and damaged, suffered physical injuries, excruciating pain and suffering, conscious pain and suffering, fear of death, mental distress, fear, anxiety, and discomfort, frustration and loss of quality of life, and died, suffering the loss of enjoyment and pleasures of life occasioned by his death, as well as wrongful death and attendant losses, including, but not limited to, loss of future earnings and benefits; and Plaintiffs suffered pecuniary loss, including expenses for the costs of Mr. SANCHEZ's funeral and the costs of administering his estate; further pecuniary loss equal to the value of support and services provided by Mr. SANCHEZ to Plaintiffs and the amount by which Mr. SANCHEZ would have increased his estate from earnings and added to the amount of the survivors' inheritance; FRANCY TATIANA RAMOS MARTINEZ and F.N.R.M have further suffered loss equal to the value of parental nurture, care and physical, moral and intellectual guidance; and other forms of harm recognized as compensable under New York's Estates, Powers and Trusts Law.

3.      Plaintiffs seek compensatory (including special) and punitive monetary damages against Defendants arising from his death, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

4.      This action is brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, the Due Process principles of the Fifth Amendment to the United States Constitution, and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and its progeny.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over the subject matter of this Complaint under the United States Constitution and 28 U.S.C. §§ 1331 and 1346 (b).

6.     Venue is proper within the United States District Court for the Southern District of New York under 28 U.S.C. § 1402 (b) in that a substantial part of the events giving rise to the claim occurred within the boundaries of the Southern District of New York.

## DISPOSITION BY FEDERAL AGENCY

7.     Pursuant to the FTCA, on or about March 10, 2017, Plaintiffs caused a Standard Form 95 to be served on the BOP, providing the BOP with the necessary information to investigate Plaintiffs' FTCA claims and their worth.

8.     In correspondence dated September 7, 2017, the BOP denied the claims.

9.     Plaintiffs have, therefore, exhausted administrative remedies with respect to their FTCA claims.

10.     This action is timely pursuant to 28 U.S.C. § 2401(b) in that it is begun within six months of receipt of the letter sent by the federal agency denying the claim.

## PRIOR, RELATED LITIGATION

11.     On March 13, 2017, after Plaintiffs had filed a timely FTCA claim and before receiving a response from the BOP, Plaintiffs filed a Summons and Complaint against Defendants BUSSANICH, BEAUDOUIN, MITCHELL, JOAQUIN, DOE M.D., and JOHN/JANE DOES Nos. 1-10, in the Supreme Court of the State of New York, County of New York, alleging medical malpractice and wrongful death and conscious pain and suffering claims under the laws of the State of New York.

12.     The New York State court action was assigned New York County Supreme Court Index Number 805103/2017.

13.     With respect to Plaintiffs' medical malpractice claims, Plaintiffs complied with New York Civil Practice Law and Rules Section 3012-a by providing the required Certificate of Merit.

14.     On May 1, 2017, represented by the United States Attorney's Office for the Southern District of New York ("USAO"), Defendants BUSSANICH, BEAUDOUIN, MITCHELL and JOAQUIN removed the New York State court action to the United States District Court for the Southern District of New York, pursuant to 42 U.S.C. § 233(c) and 28 U.S.C. § 2679(d)(2), because: (i) trial had not yet been had of this action; and (ii) this was a civil action brought against employees of the United States acting within the scope of their employment.

15.     In connection therewith, the USAO filed a certification that Defendants BUSSANICH, BEAUDOUIN, MITCHELL and JOAQUIN were employees of the United States and were acting within the scope of their employment for purposes of Plaintiffs' claims against them.

16.     The federal action, *Burton, et al. v. Bussanich, et al.,* was assigned Index No. 17 Civ. 3204 upon removal.

17.     The federal action was assigned to Hon. John G. Koeltl.

18.     On September 5, 2017, Plaintiffs and Defendants stipulated to the dismissal of the federal action without prejudice pursuant to 28 USC § 2679, *et seq.*, pursuant to the Westfall Act, for lack of administrative exhaustion.

## PARTIES

19.     On March 7, 2017, Limited Letters of Administration of the goods, chattels and credits which were of FRANKLIN RAMOS SANCHEZ, deceased, were duly issued by the

Honorable Rita Mella, Judge of the New York County Surrogate's Court, to Plaintiff KENNETH MARK BURTON, who thereupon, qualified, and thereafter acted and is still acting as such Administrator, on behalf of the survivors and next-of-kin of the decedent.

20.     At all times herein mentioned, plaintiff KENNETH MARK BURTON, ESQ. was a resident of Denver, Colorado.

21.     At all times herein mentioned, Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ was a resident of Colombia.

22.     Between January of 2015 through the date of his death on March 15, 2015, Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ was incarcerated in the United States Bureau of Prisons facility at 150 Park Row, the Metropolitan Correctional Center ("MCC") – New York.

23.     In March of 2015, Mr. SANCHEZ was housed in Tier No. 8 in Unit 11 South in the MCC.

24.     At all times herein mentioned, Plaintiff MAGDA LILIANA MARTINEZ ACOSTA was a resident of Colombia, and the wife of FRANKLIN RAMOS SANCHEZ.

25.     At all times herein mentioned, plaintiff FRANCY TATIANA RAMOS MARTINEZ was a resident of Colombia, and the adult daughter of FRANKLIN RAMOS SANCHEZ and MAGDA LILIANA MARTINEZ ACOSTA.

26.     At all times herein mentioned, plaintiff F.N.R.M., was a resident of Colombia, and the infant son of Plaintiffs' Decedent FRANKLIN RAMOS SANCHEZ and MAGDA LILIANA MARTINEZ ACOSTA, his mother. "M/N/G" stands for "mother and natural guardian."

27.     F.N.R.M. lives with plaintiff ACOSTA in Colombia.

28.     Defendant UNITED STATES OF AMERICA is the appropriate defendant for Plaintiffs' claims under the Federal Tort Claims Act.

29.     At all times herein mentioned the defendant ANTHONY BUSSANICH, M.D. (hereinafter "BUSSANICH") was employed by the BOP.

30.     With respect to Plaintiffs' *Bivens* claims herein, BUSSANICH is sued in his individual capacity.

31.     At all times herein mentioned the defendant BUSSANICH was or represented himself to be a physician duly licensed or authorized to practice medicine in the State of New York.

32.     At all times hereinafter mentioned the defendant BUSSANICH was or represented to the public in general, and to the Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ in particular, to be able, competent and qualified to skillfully diagnose, care for, and treat patients in general, and the Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ in particular, in accordance with good and accepted standards of medical care and practice.

33.     At all times hereinafter mentioned the defendant BUSSANICH undertook to and did provide medical, diagnostic and technical examinations, evaluations, consultations, care, treatments, procedures, services, or advise of, for and to Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ.

34.     At all times herein mentioned the defendant ROBERT BEAUDOUIN, M.D. (hereinafter "BEAUDOUIN") was employed by the BOP.

35.     With respect to Plaintiffs' *Bivens* claims herein, Defendant BEAUDOUIN is sued in his individual capacity.

36.     At all times herein mentioned the defendant BEAUDOUIN, was or represented himself to be a physician duly licensed or authorized to practice medicine in the State of New York.

37.     At all times hereinafter mentioned the defendant BEAUDOUIN was or represented to the public in general, and to the Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ in particular, to be able, competent and qualified to skillfully diagnose, care for, and treat patients in general, and the Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ in particular, in accordance with good and accepted standards of medical care and practice.

38.     At all times hereinafter mentioned the defendant BEAUDOUIN undertook to and did provide medical, diagnostic and technical examinations, evaluations, consultations, care, treatments, procedures, services, or advise of, for and to Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ.

39.     At all times herein mentioned the defendant TUNESIA MITCHELL, PA-C (hereinafter "MITCHELL") was employed by the BOP.

40.     With respect to Plaintiffs' *Bivens* claims herein, Defendant MITCHELL is sued in his/her individual capacity.

41.     At all times herein mentioned the defendant MITCHELL was or represented themself to be a Physician Assistant duly licensed or authorized to practice as a physician assistant in the State of New York.

42.      At all times hereinafter mentioned the defendant MITCHELL was or represented to the public in general, and to the Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ in particular, to be able, competent and qualified to skillfully diagnose, care for, and treat patients

in general, and the Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ in particular, in accordance with good and accepted standards of medical care and practice.

43.     At all times hereinafter mentioned the defendant MITCHELL undertook to and did provide medical, diagnostic and technical examinations, evaluations, consultations, care, treatments, procedures, services, or advise of, for and to Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ.

44.     At all times herein mentioned the defendant YSMAEL JOAQUIN (hereinafter referred to as "JOAQUIN") was employed by the BOP.

45.     With respect to Plaintiffs' *Bivens* claims herein, Defendant JOAQUIN is sued in his individual capacity.

46.     At all times herein mentioned the defendant JOAQUIN was or represented themself to be a Mid-Level Practitioner licensed or authorized to practice as a Mid-Level Practitioner in the State of New York.

47.     At all times hereinafter mentioned the defendant JOAQUIN was or represented to the public in general, and to the Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ in particular, to be able, competent and qualified to skillfully diagnose, care for, and treat patients in general, and the Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ in particular, in accordance with good and accepted standards of medical care and practice.

48.     At all times hereinafter mentioned the defendant JOAQUIN undertook to and did provide medical, diagnostic and technical examinations, evaluations, consultations, care, treatments, procedures, services, or advise of, for and to Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ.

49.     At all times herein mentioned the defendant JOHN DOE, M.D. (hereinafter referred to as "DOE M.D.") was employed by the BOP.

50.     With respect to Plaintiffs' *Bivens* claims, DEFENDANT DOE is sued in his/her individual capacity.

51.     At all times herein mentioned the defendant DOE M.D. was or represented themself to be a physician duly licensed or authorized to practice medicine in the State of New York.

52.     DOE M.D. is referred to below as a "bilingual Attending Physician" who provided Mr. Sanchez with medical care on March 13, 2015.

53.     At all times hereinafter mentioned the defendant DOE M.D. was or represented to the public in general, and to the Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ in particular, to be able, competent and qualified to skillfully diagnose, care for, and treat patients in general, and the Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ in particular, in accordance with good and accepted standards of medical care and practice.

54.     At all times hereinafter mentioned the defendant DOE M.D. undertook to and did provide medical, diagnostic and technical examinations, evaluations, consultations, care, treatments, procedures, services, or advise of, for and to Plaintiffs' decedent FRANKLIN RAMOS SANCHEZ.

55.     At all times herein mentioned the Defendants OPERATIONAL LT. SHIVERS, BOP JOHN DOE SUPERVISOR 1, BOP JOHN DOE SUPERVISOR 2, and JOHN/JANE DOES NOS. 1-10 were employed by the BOP.

56.     At all times herein mentioned the defendants OPERATIONAL LT. SHIVERS, BOP JOHN DOE SUPERVISOR 1, BOP JOHN DOE SUPERVISOR 2, and JOHN/JANE

DOES NOS. 1-10 were present in MCC-NYC Tier No. 8 in Unit 11 South between March 13, 2015 and March15, 2015.

57.     Defendant BOP JOHN DOE SUPERVISOR 1 is the JOHN DOE SUPERVISOR described below who was on duty the night/morning of March 13-14, 2015 in MCC-NYC Tier No. 8 in Unit 11 South.

58.     Defendant BOP JOHN DOE SUPERVISOR 2 is the JOHN DOE SUPERVISOR described below who was on duty the night/morning of March 14-15, 2015 in MCC-NYC Tier No. 8 in Unit 11 South.

59.     Upon information and belief, Defendant OPERATIONAL LT. SHIVERS was a supervisor who was on duty the night/morning of March 14-15, 2015 in MCC-NYC Tier No. 8 in Unit 11 South.

60.     Defendants JOHN/JANE DOES NOS. 1-10 were BOP employees who were on duty the night/morning of March 14-15, 2015 in MCC-NYC Tier No. 8 in Unit 11 South.

61.     At all times herein mentioned the defendants OPERATIONAL LT. SHIVERS, BOP JOHN DOE SUPERVISOR 1, BOP JOHN DOE SUPERVISOR 2, and JOHN/JANE DOES NOS. 1-10 were aware of Mr. SANCHEZ's dire medical condition as he and other inmates screamed for medical assistance for Mr. SANCHEZ in MCC-NYC Tier No. 8 in Unit 11 South over the weekend after March 13, 2015 and before Mr. SANCHEZ's death on March 15, 2015.

62.     At all times relevant to this Complaint, defendants BUSSANICH, BEAUDOUIN, MITCHELL, JOAQUIN, DOE M.D., OPERATIONAL LT. SHIVERS, BOP JOHN DOE SUPERVISOR 1, BOP JOHN DOE SUPERVISOR 2, and JOHN/JANE DOES Nos. 1-10 were acting within the scope and course of their employment for BOP.

63.     With respect to Plaintiffs' *Bivens* claims herein, Defendants Defendants OPERATIONAL LT. SHIVERS, BOP JOHN DOE SUPERVISOR 1, BOP JOHN DOE SUPERVISOR 2, and JOHN/JANE DOES NOS. 1-10 are sued in their individual capacities.

## FACTUAL ALLEGATIONS

64.     FRANKLIN RAMOS SANCHEZ was a Colombian national, married to plaintiff MAGDA LILIANA MARTINEZ ACOSTA, with whom he had two children: plaintiff adult daughter FRANCY TATIANA RAMOS MARTINEZ and plaintiff son F.N.R.M.

### MR. SANCHEZ'S 2014 ARREST AND EXTRADITION

65.     On February 13, 2014, Mr. SANCHEZ was arrested in Cartagena, Colombia as the result of a sting involving United States agents.

66.     Mr. SANCHEZ was taken to La Picota Prison in Bogata, Colombia, where he remained until January 28, 2015.

67.     On January 28, 2015, Mr. SANCHEZ was extradited to the United States to face drug-related conspiracy charges in US v. Sanchez, 14-cr-00006 (NRB) (EDNY).

68.     From January 28, 2015 until his death, Mr. SANCHEZ was a pre-trial detainee at the MCC.

69.     Upon information and belief, Mr. SANCHEZ was housed at Tier No. 8 in Unit 11 South in MCC – New York at all times relevant herein after January 28, 2015.

### MR. SANCHEZ'S MEDICAL HISTORY IN BOP CUSTODY: JANUARY 28 – MARCH 12, 2015

70.     On January 28, 2015, Mr. SANCHEZ's initial BOP "Health Services Health Screen" diagnoses Mr. SANCHEZ with "Chronic Hypertension."

71.      The 1/28/15 Health Services Health Screen marks Mr. SANCHEZ's Hypertension History" as the first "Potential Items For Follow-Up."

72.     The 1/28/15 Health Services Health Screen notes that Mr. Sanchez's Blood Pressure was 113/78, and that Mr. SANCHEZ was "taking Enalapril 20mg 2x/day and Aspirin 81 mg" for diagnosed Adult (18-30) onset Hypertension when he was admitted to BOP custody.

73.     The 1/28/15 Health Services Health Screen orders that Hypertension Chronic Care Clinic laboratory testing in the form of a Comprehensive Metabolic Profile, Glucose, Lipid Profile, and Urinalysis be performed on January 29, 2015.

74.     As treatment for Mr. SANCHEZ's hypertension, the 1/28/15 Health Services Health Screen prescribed 20mg of Lisinopril twice a day and 81mg of Aspirin once daily.

75.      On January 29, 2015, at around 7:05am, defendant BUSSANICH, then Clinical Director at MCC - New York, co-signed the 1/28/15 Health Services Health Screen, designated Mr. SANCHEZ "Medical Care Level 2", and added Mr. SANCHEZ to the Hypertension Clinic.

76.     At around 10:41am, defendant BEAUDOUIN cancelled the Hypertension Chronic Care Clinic laboratory Comprehensive Metabolic Profile, Glucose, Lipid Profile, and Urinalysis tests that had been ordered on January 29, 2015, and added the Diabetic Chronic Care Clinic laboratory testing in the form of a CBC w/diff, Comprehensive Metabolic Profile, Lipid Profile, Microalbumin, urine random, DTSH, Hemoglobin A1C, Urinalysis, and fecal occult blood tests.

77.     At around 1:24pm on January 29, 2015, defendant BUSSANICH lowered Mr. SANCHEZ's 20 mg Lisinopril dosage from twice a day to once a day.

78.      On February 2, 2015, at around 9:50am, defendant BEAUDOUIN had a "Chronic Care Encounter" with Mr. SANCHEZ.

79.     In addition to noting "Hypertension" as Mr. SANCHEZ's chief complaint and recording that Mr. SANCHEZ then had a "35 year" history of hypertension for which he had

been taking Enalapril and Aspirin, defendant BEAUDOUIN's notes record reports of a history of "chronic rhinitis" and "nasal congestion" as well as "on and off headache that responds well to Tylenol."

80.     Defendant BEAUDOUIN's notes reflect that Mr. SANCHEZ's Blood Pressure was 127/87 at 9:40am on February 2, 2015.

81.     Defendant BEAUDOUIN renewed the standing medication orders - 20mg Lisinopril and 81mg of Aspirin once daily.

82.     Defendant BEAUDOUIN scheduled a chest x-ray related to Mr. SANCHEZ's hypertension diagnosis to be conducted by February 18, 2015.

83.     Defendant BEAUDOUIN scheduled the next Chronic Care Visit regarding Mr. SANCHEZ's hypertension diagnosis for July 29, 2015.

84.     Defendant BEAUDOUIN prescribed Flunisolide Nasal (Nasalide) 0.025%, 25ml for Mr. SANCHEZ's nasal congestion and 325mg Acetaminophen tablets to be taken two tablets by mouth three times daily as needed for headache for Mr. SANCHEZ.

85.     On February 9, 2015, MLP E. Ramos conducted a physical of Mr. SANCHEZ.

86.     MLP Ramos's notes reflect that Mr. SANCHEZ's Blood Pressure was 112/75 at 10:06 on February 9, 2015.

87.     MLP Ramos's notes include Mr. SANCHEZ's "Hypertension History" as first among the "Potential Items For Follow-Up."

88.     The February 9, 2015 notes reflect a "New Radiology Request Order[]' due February 10, 2015 for 2 chest x-rays related to Mr. SANCHEZ's hypertension diagnosis.

89.     On February 9, 2015, at around 10:03am, defendant BUSSANICH cosigned MPLP Ramos's report.

90.     On February 12, 2015, Mr. SANCHEZ had a chest x-ray with "Negative" findings and conclusions.

91.     On February 13, 2015, defendant BEAUDOUIN entered his notes regarding the February 2, 2015 "Chronic Care Encounter" and those notes indicate that defendant BEAUDOUIN "counsel[ed]" Mr. SANCHEZ about his diagnosis and other matters related to the February 2, 2015 "encounter" on February 13, 2015.

92.     On February 17, 2015, defendant BEAUDOUIN extended Mr. SANCHEZ's once daily 20mg Lisinopril and 81mg Aspirin prescriptions through August 16, 2015.

93.     On March 2, 2015, Mr. SANCHEZ had a chest x-ray with "Negative" findings and conclusions.

94.     On March 3, 2015, defendant BUSSANICH reviewed the chest x-ray findings.

**MR. SANCHEZ' DEATH FROM ACUTE PANCREATITIS – MARCH 13-15, 2015**

95.     On the morning of Friday, March 13, 2015, Mr. SANCHEZ was nauseated, vomiting, and experiencing incredible pain.

96.     According to the BOP's March 13, 2015 "Clinical Encounter" record, at 11:22am, defendants MITCHELL and DOE M.D., an unidentified, bilingual Attending MD who acted as translator, had a "Sick Call/Triage encounter" with Mr. SANCHEZ regarding "Abdominal Pain" as his "Chief Complaint."

97.     Mr. SANCHEZ described "upper mid abdominal pain" that he had been experiencing for two hours and said he "sought treatment due to increase pain in the past 20 minutes."

98.     Mr. SANCHEZ reported that he had vomited twice.

99.     Mr. SANCHEZ described the pain as a "10" out of 10.

100.     Mr. SANCHEZ described the pain as "burning."

101.      The March 13, 2015 "Clinical Encounter" record notes that Mr. SANCHEZ's Blood Pressure was 127/81 and 135/72 when measured at 11:25am.

102.     Mr. SANCHEZ's abdomen was "soft" and "tender."

103.     The March 13, 2015 "Clinical Encounter" record diagnoses Mr. SANCHEZ with "Reflux esphoagitis" and prescribes 150mg of Ranitidine orally for seven days (to be purchased by Mr. SANCHEZ from the commissary), 20mg of Omeprazole, and 32mg of Acetaminophen.

104.     The "Clinical Encounter" record includes as notes that Mr. SANCHEZ was "advised to refrain from eating chocolate, spicy foods, and caffeine" and to "followup at sick call as needed and return immediately if condition worsens" and that he was to "[a]lert staff if symptoms despite treatment, blood in stool or black stool, loa, fever, weakness, vomitus has blood or yellow, increase symptoms or any concerns."

105.     The next BOP medical record from March 13, 2015 relates to a "Followup encounter" Mr. SANCHEZ had with defendant BEAUDOUIN at 2:39pm in which Mr. SANCHEZ's "Chief Complaint" was again "Abdominal Pain" that he had been experiencing for "6 hours."

106.     The record further notes that Mr. SANCHEZ had a "normal bowel movement" in the morning that did not worsen the pain.

107.     The record notes that Mr. SANCHEZ described the pain as a "10" out of 10.

108.     The record notes that Mr. SANCHEZ appeared "Distressed" and "in Pain".

109.     Defendant BEAUDOUIN scheduled an x-ray to be conducted of Mr. SANCHEZ's abdomen on March 18, 2015.

110.    On March 13, 2015, Defendant BEAUDOUIN diagnosed Mr. SANCHEZ with "Constipation" and prescribed him with a draught of Citrate of Magnesia Oral solution, Ducosate Sodium Capsule, 100mg 3x a day for seven days, and a 8.6mg Senna Tablet twice daily for two days.

111.    The medical record notes that Mr. SANCHEZ was to "follow-up at sick call as needed" as well as that he was "have a follow-up by the nurse on duty in the next few hours" and "to inform heal[t]h services unit via the unit officer if he does not get better."

112.    At no time on or after March 13, 2015 was Mr. Sanchez allowed a follow-up by the nurse on duty.

113.    Although, as seen below, Mr. SANCHEZ, and others, screamed and complained loudly, and Mr. Sanchez otherwise demonstrated in visibly obvious ways, that Mr. SANCHEZ was having a deadly medical emergency, OPERATIONAL LT. SHIVERS, BOP JOHN DOE SUPERVISOR 1, BOP JOHN DOE SUPERVISOR 2, and JOHN/JANE DOES Nos. 1-10 – all BOP employees who were present on Tier No. 8 in Unit 11 South in the MCC between the afternoon of March 13, 2015 and his death on March 15, 2015 – failed to inform health services as instructed in Defendant BEAUDOUIN's March 13, 2015 medical record entry.

114.    Although, as seen below, Mr. SANCHEZ, and others, screamed and complained loudly, and Mr. Sanchez otherwise demonstrated in visibly obvious ways, that Mr. SANCHEZ was having a deadly medical emergency, OPERATIONAL LT. SHIVERS, BOP JOHN DOE SUPERVISOR 1, BOP JOHN DOE SUPERVISOR 2, and JOHN/JANE DOES Nos. 1-10 failed to take any steps to provide Mr. Sanchez with access to medical attention.

115.    At around 2:45pm on March 13, 2015, an x-ray was conducted of Mr. SANCHEZ's abdomen, with "Negative" findings and conclusions.

116.   Defendant BUSSANINCH reviewed that x-ray on Monday, March 16, 2015 – after Mr. SANCHEZ had died.

117.   On Saturday, March 14, 2015, Mr. SANCHEZ was in great pain and shaking, could not get up on his own, and traded bunks with his cellmate Leyrani Gomez because he could not climb into his upper bunk.

118.   By around 11pm on March 14, 2015, Mr. SANCHEZ was in such pain he was crying and screaming from within his pod.

119.   Other inmates summoned a defendant B.O.P. DOE SUPERVISOR 1, who told them in sum and substance that Mr. SANCHEZ would have to wait until Monday, as there was no Doctor available over the weekend.

120.   At some time after midnight on Sunday, March 15, 2015, Mr. SANCHEZ was again in such pain that he was screaming from within his pod.

121.   Other inmates repeatedly summoned defendants DOE B.O.P. EMPLOYEES, including defendant B.O.P. DOE SUPERVISOR 2, believed to be a Lieutenant, who told them in sum and substance that Mr. SANCHEZ would have to wait until Monday, as there was no Doctor available over the weekend.

122.   On Sunday, March 15, 2015, morning count on Tier No. 8 in Unit 11 South, where Mr. SANCHEZ was housed, was at 10:00am.

123.   Mr. SANCHEZ could not get up for morning count without help.

124.   Soon after Mr. SANCHEZ was able to get up with help, he began to have convulsions.

125.   Foam began coming out of Mr. SANCHEZ's mouth.

126.   Mr. SANCHEZ died within minutes.

127.     According to a March 15, 2015 BOP "Clinical Encounter – Administrative Note" record created by defendant JOAQUIN, MLP at 12:47pm, at 10:20am, there was a call for a medical emergency related to Mr. SANCHEZ at 10:20am, as a result of which defendant JOAQUIN responded to 11 South.

128.     Also according to that March 15, 2015 BOP "Clinical Encounter – Administrative Note" "upon arrival" defendant JOAQUIN "found [Mr.] Sanchez laying down in his bed unresponsive…not breathing[ with] no pulse and no respons[e] to painful stimulus." [6].

129.     Also according to that March 15, 2015 BOP "Clinical Encounter – Administrative Note" defendant JOAQUIN "[i]mmediately instructed [Defendant] OPERATIONAL LT. SHIVERS to call" Emergency Medical Services ("EMS") and "asked for a stretcher and AED" before "doing CPR" until the stretcher arrived.

130.     Also according to that March 15, 2015 BOP "Clinical Encounter –Administrative Note" defendant JOAQUIN then continued to perform CPR and used the AED machine until EMS arrived.

131.     Also according to that March 15, 2015 BOP "Clinical Encounter – Administrative Note" Mr. SANCHEZ "had coffee color fluid coming out of his mouth" before "EMS staff took over" and "departed the institution doing CPR."

132.     According to a March 15, 2015 BOP "Clinical Encounter" record created by defendant JOAQUIN at 1:12pm, at 10:20am, Mr. SANCHEZ was "unresponsive" with "no breathing and no pulse."

133.     Also according to a March 15, 2015 BOP "Clinical Encounter" record created by defendant JOAQUIN at 1:12pm, at 10:20am, Mr. SANCHEZ was in "Cardiac arrest."

134.     Mr. SANCHEZ died on March 15, 2015 while in BOP custody.

135.    On Monday, March 16, 2015, defendant BEAUDOIN cosigned MLP Joaquin's Clinical Encounter and both administrative notes regarding Mr. Sanchez's death on March 15, 2015.

136.    Also on March 16, 2015, Dr. John A. Hayes, of the Office of the Chief Medical Examiner of the City of New York, performed an autopsy and determined that Mr. Sanchez died of necrotizing pancreatitis with complicating cholelithiasis, with hypertensive and atherosclerotic cardiovascular disease as a contributory factor.

## FIRST CLAIM FOR RELIEF

### All Plaintiffs v. Defendant UNITED STATES OF AMERICA

### Federal Tort Claims Act- Medical Malpractice

137.    Plaintiffs repeat and reiterate each and every allegation contained in paragraphs numbered "1" through "136" above with the same force and effect as if fully set forth herein.

138.    Commencing on or about January 28, 2015, and at all times hereafter complained of, defendants undertook and endeavored to, and did advise and treat Mr. SANCHEZ professionally as a hospital or physician including providing diagnosis, care, and treatment for his diagnosed and well-documented, decades-long history of Hypertension and other medical conditions.

139.    At all times complained of herein defendants represented themselves to be skilled, competent and careful physicians, physician assistants, and mid-level practitioners with the knowledge and capacity to practice medicine in accordance with the standards common and acceptable in the community.

140.    As set forth herein the defendants' treatment of Mr. SANCHEZ fell below acceptable standards and skills and defendants breached the duty they owed to Mr. SANCHEZ.

141.    In fact, defendants did not possess the necessary skill to treat Mr. SANCHEZ and neglected to apply the skill they did have and did not use reasonable care in applying its skill and mistreated Mr. SANCHEZ and engaged in poor medical practice and practice which fell below the customary standard.

142.    The defendants were negligent and departed from the standard of care in ignoring Mr. SANCHEZ's symptoms, and delaying treatment for obvious acute pancreatitis.

143.    Beginning on January 28, 2015 – the day of Mr. SANCHEZ's initial BOP medical screen - BOP medical personnel knew of Mr. SANCHEZ's decades-long history of high blood pressure and hypertension and that he required and was taking Enalapril (a type of medication among a class called angiotensin-converting enzyme ("ACE") inhibitors) and Aspirin to manage his hypertension on a daily basis.

144.    Beginning on January 29, 2015 – the next day - defendants BUSSANICH and BEAUDOUIN were also aware of those facts.

145.    Also on January 29, 2015, defendant BUSSANICH prescribed Mr. SANCHEZ Lisinopril, an ACE inhibitor.

146.    Lisinopril is a drug associated with inducing acute pancreatitis.

147.    Acute pancreatitis is an inflammatory condition that can be fatal if left undiagnosed or untreated, and was fatal in Mr. SANCHEZ's case.

148.    Also on January 29, 2015, defendant BUSSANICH ordered bloodwork and other testing.

149.    There is no indication in the medical records provided by BOP that such bloodwork and/or testing were conducted or as to what the results were.

150.    Between January of 2015 and March 13, 2015, defendants BUSSANICH and BEAUDOUIN were both aware of the need to monitor and medically manage Mr. SANCHEZ's hypertension and any potentially related secondary conditions, including acute pancreatitis

151.     Defendants BUSSANICH and BEAUDOUIN were negligent and departed from the standard of care in not monitoring plaintiff for any potentially related secondary conditions, including acute pancreatitis.

152.    Because they did not do so, Mr. SANCHEZ developed acute pancreatitis.

153.    By the morning of March 13, 2015, Mr. SANCHEZ was vomiting and nauseated as a result of his acute pancreatitis.

154.    On March 13, 2015, when he first saw BOP medical providers, defendants T. MITCHELL and a DOE M.D., bilingual Attending M.D. who is not identified by name in the records that have been provided to date, at around 11:30am Mr. SANCHEZ reported that he had been vomiting and experiencing a 10 out of 10 pain.

155.    Because of Mr. SANCHEZ's history of hypertension, ACE inhibitor use, and symptoms (including his severe abdominal pain and tenderness), defendants MITCHELL and DOE M.D. were negligent and departed from the standard of care in not including pancreatitis in their diagnostic differential, and in not ordering blood tests (such as a comprehensive metabolic panel, Profile 1 and/or 2, and/or amylase or lipase tests) or other lab work to rule out pancreatitis or other underlying causes.

156.    Defendant MITCHELL was negligent and departed from the standard of care in misdiagnosing Mr. SANCHEZ with reflux.

157.    When Mr. SANCHEZ returned to BOP medical care and saw defendant BEAUDOIN at around 2:40 pm later on the afternoon of March 13, 2015, again complaining of

pain in his abdomen that was a 10 out of 10 and abdominal tenderness – by then for at least six hours – he told defendant BEAUDOIN that he had a normal bowel movement that day.

158.     Defendant BEAUDOUIN scheduled an x-ray to be conducted of Mr. SANCHEZ's abdomen on March 13, 2015, and the x-ray was conducted that afternoon with "Negative" findings and conclusions.

159.     There is no evidence in the medical records that any Defendant reviewed that x-ray on March 13, 2015 or after March 13, 2015 and before Mr. SANCHEZ's death on March 15, 2015.

160.     Defendants were negligent and departed from the standard of care in failing to promptly take and/or read x-rays and/or other imaging studies in order to diagnose Mr. SANCHEZ's acute pancreatitis.

161.     Mr. SANCHEZ was presenting with symptoms of acute pancreatitis.

162.     Defendant BEAUDOUIN was negligent and departed from the standard of care in failing to order blood tests (such as a comprehensive metabolic panel, Profile 1 and/or 2, and/or amylase or lipase tests) or other labwork to rule out pancreatitis or other underlying causes.

163.     Defendant BEAUDOUIN was negligent and departed from the standard of care in mis-diagnosing Mr. SANCHEZ with constipation, which was contra-indicated by the report of a normal bowel movement and the "negative" x-ray findings.

164.     Had defendants MITCHELL, DOE M.D. or BEAUDOUIN ordered such blood tests or other labwork, they would have shown that, in fact, beginning on March 13, 2015 and through March 15, 2015, Mr. SANCHEZ was dying of acute pancreatitis and required emergency treatment for it.

165.    Although defendant BEAUDOUIN's March 13, 2015 note advises Mr. SANCHEZ to "follow up at sick call" and to "inform heal[t]h services unit via the unit officer if he does not get better," defendant BEAUDOUIN was negligent and departed from the standard of care in failing to inform the unit officer(s) or any other BOP officers of Mr. SANCHEZ's need to have access to health services over the weekend if his condition did not get better or worsened.

166.    Defendants were negligent and departed from the standard of care in other ways that are documented in the Medical Records and in ways of which Plaintiffs are not yet aware.

167.    As a direct and proximate result of defendants' negligence, Mr. SANCHEZ suffered acute pancreatitis, severe pain, and ultimately death.

168.    The treatment rendered by the defendants was not in accordance with the proper practice that is generally recognized in the community and fell below acceptable standards.

169.    As hereafter set forth the defendants' diagnosis, care, and treatment of Mr. SANCHEZ fell below acceptable standards and skills and defendants breached the duty which they owed to plaintiff.

170.    Mr. SANCHEZ's injuries were inflicted solely through the negligence of the defendants, and through no fault or want of care of negligence or contributory negligence on the part of Mr. SANCHEZ.

171.    Defendants' conduct was grossly negligent in that defendants were so careless as to show complete disregard for the rights and safety of Mr. SANCHEZ.

172.    Defendants engaged in willful misconduct in that defendants acted in such a reckless manner as to completely disregard the consequences of their actions.

173.    As a direct, legal and proximate result of the foregoing, including the aforesaid negligent acts and omissions and medical malpractice of the defendants, Plaintiffs' decedent Mr.

SANCHEZ was injured and damaged, suffered physical injuries, excruciating pain and suffering, conscious pain and suffering, fear of death, mental distress, fear, anxiety, and discomfort, frustration and loss of quality of life, and died, suffering the loss of enjoyment and pleasures of life occasioned by his death, as well as wrongful death and attendant losses, including, but not limited to, loss of future earnings and benefits.

174.     As a direct, legal and proximate result of the foregoing, including the aforesaid negligent acts and omissions and medical malpractice of the Defendants, plaintiffs MAGDA LILIANA MARTINEZ ACOSTA, FRANCY TATIANA RAMOS MARTINEZ, and F.N.R.M., who are Mr. SANCHEZ's heirs and distributees, suffered:

A.  Pecuniary loss, including expenses for the costs of Mr. SANCHEZ's funeral and the costs of administering his estate;

B.  Further pecuniary loss equal to the value of support and services provided by Mr. SANCHEZ to Plaintiffs and the amount by which Mr. SANCHEZ would have increased his estate from earnings and added to the amount of the survivors' inheritance;

C.  FRANCY TATIANA RAMOS MARTINEZ and F.N.R.M have further suffered loss equal to the value of parental nurture, care and physical, moral and intellectual guidance; and

D.  Other forms of harm recognized as compensable under New York's Estates, Powers and Trusts Law.

175.     Defendants' acts and omissions constitute the tort of medical malpractice under the laws of the State of New York.

176.    Under the Federal Tort Claims Act, defendant United States of America is liable for the individual Defendants' acts and omissions.

## SECOND CLAIM FOR RELIEF

### All Plaintiffs v. Defendant UNITED STATES OF AMERICA

### Federal Tort Claims Act- Wrongful Death and Conscious Pain and Suffering

177.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs numbered "1" through "176" above with the same force and effect as if fully set forth herein.

178.    Medical treatment for Mr. SANCHEZ's acute pancreatitis between March 13, 2015 and March 15, 2015 was required to save Mr. Mr. SANCHEZ's life.

179.    Because Mr. SANCHEZ was not given such treatment, he suffered for days before he died a painful death as his organs shut down from acute pancreatitis.

180.    Ultimately, by around 10:00am on March 15, 2015, as a result of acute necrotic pancreatitis, the level of glucose in Mr. SANCHEZ's system was so high that he went into full shutdown, went into cardiac arrest, and died at MCC – New York.

181.    As set forth above in the first cause of action, the defendants were negligent and departed from the standard of care in numerous ways which resulted in Mr. SANCHEZ developing acute pancreatitis, suffering extreme pain and suffering as his organs shut down, and ultimately Mr. SANCHEZ's death.

182.    After the time Mr. SANCHEZ developed pancreatitis, he was oriented and alert and conscious of feeling excruciating pain and suffering, and he knew his condition was deteriorating.

183.     Between March 13-15, 2015, Mr. SANCHEZ and other inmates repeatedly complained to the JOHN/JANE DOE defendants that Mr. SANCHEZ was in pain and required medical attention.

184.     Between March 13-15, 2015, the JOHN/JANE DOE defendants failed to summon medical care for Mr. SANCHEZ and to provide him access to such medical care.

185.     As a direct, legal and proximate result of the foregoing, including the aforesaid negligent acts and omissions and medical malpractice of the defendants, Plaintiffs' decedent Mr. SANCHEZ was injured and damaged, suffered physical injuries, excruciating pain and suffering, conscious pain and suffering, fear of death, mental distress, fear, anxiety, and discomfort, frustration and loss of quality of life, and died, suffering the loss of enjoyment and pleasures of life occasioned by his death, as well as wrongful death and attendant losses, including, but not limited to, loss of future earnings and benefits.

186.     As a direct, legal and proximate result of the foregoing, including the aforesaid negligent acts and omissions and medical malpractice of the defendants and wrongful death of Mr. SANCHEZ, plaintiffs MAGDA LILIANA MARTINEZ ACOSTA, FRANCY TATIANA RAMOS MARTINEZ, and F.N.R.M., who are Mr. SANCHEZ's heirs and distributees, have suffered:

A. Pecuniary loss, including expenses for the costs of Mr. SANCHEZ's funeral and the costs of administering his estate;

B. Further pecuniary loss equal to the value of support and services provided by Mr. SANCHEZ to Plaintiffs and the amount by which Mr. SANCHEZ would have increased his estate from earnings and added to the amount of the survivors' inheritance;

C. FRANCY TATIANA RAMOS MARTINEZ and F.N.R.M have further suffered loss

equal to the value of parental nurture, care and physical, moral and intellectual

guidance; and

D. Other forms of harm recognized as compensable under New York's Estates, Powers

and Trusts Law.

187.     Defendants' acts and omissions constitute the tort of wrongful death and

conscious pain and suffering under the Laws of the State of New York.

188.     Under the Federal Tort Claims Act, defendant United States of America is liable

for Defendants' acts and omissions.

**THIRD CLAIM FOR RELIEF**

**All Plaintiffs v. Defendant UNITED STATES OF AMERICA**

**<u>Federal Tort Claims Act- Negligence</u>**

189.     Plaintiffs repeat and reiterate each and every allegation contained in paragraphs

numbered "1" through "188" above with the same force and effect as if fully set forth herein.

190.     As set forth more fully elsewhere herein, including in the First Claim for Relief

above, and the Fifth Claim for Relief below, Defendants owed Plaintiffs' decedent duties to

provide adequate medical care, and failed to comply with those duties to provide Mr. SANCHEZ

with adequate medical care.

191.     As a direct, legal and proximate result of the foregoing, including the aforesaid

negligent acts and omissions and medical malpractice of the defendants, Plaintiffs' decedent Mr.

SANCHEZ was injured and damaged, suffered physical injuries, excruciating pain and suffering,

conscious pain and suffering, fear of death, mental distress, fear, anxiety, and discomfort,

frustration and loss of quality of life, and died, suffering the loss of enjoyment and pleasures of

life occasioned by his death, as well as wrongful death and attendant losses, including, but not limited to, loss of future earnings and benefits.

192.    As a direct, legal and proximate result of the foregoing, including the aforesaid negligent acts and omissions and medical malpractice of the defendants and wrongful death of Mr. SANCHEZ, plaintiffs MAGDA LILIANA MARTINEZ ACOSTA, FRANCY TATIANA RAMOS MARTINEZ, and F.N.R.M., who are Mr. SANCHEZ's heirs and distributees, have suffered:

A. Pecuniary loss, including expenses for the costs of Mr. SANCHEZ's funeral and the costs of administering his estate;

B. Further pecuniary loss equal to the value of support and services provided by Mr. SANCHEZ to Plaintiffs and the amount by which Mr. SANCHEZ would have increased his estate from earnings and added to the amount of the survivors' inheritance;

C. FRANCY TATIANA RAMOS MARTINEZ and F.N.R.M have further suffered loss equal to the value of parental nurture, care and physical, moral and intellectual guidance; and

D. Other forms of harm recognized as compensable under New York's Estates, Powers and Trusts Law.

193.    Defendants' acts and omissions constitute the tort of negligence under the laws of the State of New York.

194.    Under the Federal Tort Claims Act, defendant UNITED STATES OF AMERICA is liable for Defendants' acts and omissions.

**FOURTH CLAIM FOR RELIEF**

**All Plaintiffs v. Defendant UNITED STATES OF AMERICA**

**Federal Tort Claims Act- Negligent Supervision, Hiring and Retention**

195.    Plaintiffs repeat and reiterate each and every allegation contained in paragraphs numbered "1" through "194" above with the same force and effect as if fully set forth herein.

196.    The aforementioned acts and omissions against Plaintiffs' decedent were a direct result of the negligence, carelessness, and recklessness of Defendant UNITED STATES OF AMERICA in failing to meet its duty of care to Plaintiffs in its screening, hiring, training, supervising, evaluating, and retaining of Defendants.

197.    As a direct, legal and proximate result of the foregoing, including the aforesaid negligent acts and omissions and medical malpractice of the defendants, Plaintiffs' decedent Mr. SANCHEZ was injured and damaged, suffered physical injuries, excruciating pain and suffering, conscious pain and suffering, fear of death, mental distress, fear, anxiety, and discomfort, frustration and loss of quality of life, and died, suffering the loss of enjoyment and pleasures of life occasioned by his death, as well as wrongful death and attendant losses, including, but not limited to, loss of future earnings and benefits.

198.    As a direct, legal and proximate result of the foregoing, including the aforesaid negligent acts and omissions and medical malpractice of the defendants and wrongful death of Mr. SANCHEZ, plaintiffs MAGDA LILIANA MARTINEZ ACOSTA, FRANCY TATIANA RAMOS MARTINEZ, and F.N.R.M., who are Mr. SANCHEZ's heirs and distributees, have suffered:

    A. Pecuniary loss, including expenses for the costs of Mr. SANCHEZ's funeral and the costs of administering his estate;

B. Further pecuniary loss equal to the value of support and services provided by Mr.

SANCHEZ to Plaintiffs and the amount by which Mr. SANCHEZ would have

increased his estate from earnings and added to the amount of the survivors'

inheritance;

C. FRANCY TATIANA RAMOS MARTINEZ and F.N.R.M have further suffered loss

equal to the value of parental nurture, care and physical, moral and intellectual

guidance; and

D. Other forms of harm recognized as compensable under New York's Estates, Powers

and Trusts Law.

199.    Defendant UNITED STATES OF AMERICA's acts and omissions constitute the

tort of negligent supervision, retention, and hiring under the laws of the State of New York.

200.    Under the Federal Tort Claims Act, defendant UNITED STATES OF AMERICA

is liable for these actions.


**FIFTH CLAIM FOR RELIEF**

**Plaintiff BURTON as Administrator of the Estate of FRANKLIN RAMOS SANCHEZ v.
Defendants BUSSANICH, BEAUDOUIN, MITCHELL, JOAQUIN, DOE M.D.,**
OPERATIONAL LT. SHIVERS, BOP JOHN DOE SUPERVISOR 1, BOP JOHN DOE
SUPERVISOR 2, and JOHN/JANE DOES Nos. 1-10 in their individual capacities

***Bivens* Claim- Fifth Amendment – Deliberate indifference to serious medical needs**

201.    Plaintiffs repeat and reallage each and every allegation contained in paragraphs

numbered "1" through "200" above with the same force and effect as if fully set forth herein.

202.    Defendants' conduct deprived Plaintiff's decedent of his substantive due process

rights protected under the Fifth Amendment to the United States Constitution in that they failed

to provide Plaintiffs' decedent with adequate medical care although they knew or should have known that doing so posed an excessive risk to his health and safety.

203.    Defendants have deprived Plaintiffs' decedent of such rights under color of law and are liable to Plaintiff pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and its progeny.

204.    Beginning in January of 2015, and particularly between March 13-15, 2015, Defendants BUSSANICH, BEAUDOUIN, MITCHELL, JOAQUIN, and DOE M.D. or should have known, that Mr. Sanchez was at a heightened risk to develop pancreatitis as a result of prescribing and administering Lisinopril - a drug associated with inducing acute pancreatitis, an inflammatory condition that can be fatal if left undiagnosed or untreated – to Mr. SANCHEZ.

205.    Mr. Sanchez's acute pancreatitis was objectively serious in that it was life-threatening, caused Mr. Sanchez extreme pain, and ultimately resulted in his death.

206.    As set forth more fully above, including in the First Claim for Relief above, between March 13-15, 2015, Defendants BUSSANICH, BEAUDOUIN, MITCHELL, JOAQUIN, and/or DOE M.D. knew, or should have known, that Mr. Sanchez had developed, and was dying from, acute pancreatitis.

207.    As seen above,  Defendants BUSSANICH, BEAUDOUIN, MITCHELL, JOAQUIN, and/or DOE M.D. failed to ensure that Mr. SANCHEZ was seen on the afternoon of March 13, 2015 by a nurse as required pursuant to the notation in the medical records regarding Mr. SANCHEZ's 2:40pm medical visit.

208.     As seen above, Defendants BUSSANICH, BEAUDOUIN, MITCHELL, JOAQUIN, and/or DOE M.D., failed to ensure that BOP employees who were present on Tier No. 8 in Unit 11 South in the MCC between 2:40pm on March 13, 2015 and Mr. Sanchez's death

on March 15, 2015 knew that Mr. SANCHEZ required immediate medical attention over the weekend in the event that his condition did not improve.

209.    Although, as seen above, between March 13-15, 2015, Mr. SANCHEZ, and others, screamed and complained loudly, and Mr. Sanchez otherwise demonstrated in visibly obvious ways, that Mr. SANCHEZ was having a deadly medical emergency, OPERATIONAL LT. SHIVERS, BOP JOHN DOE SUPERVISOR 1, BOP JOHN DOE SUPERVISOR 2, and JOHN/JANE DOES Nos. 1-10 failed to inform health services as instructed in Defendant BEAUDOUIN's March 13, 2015 2:40pm medical record entry.

210.    Although, as seen above, between March 13-15, 2015, Mr. SANCHEZ, and others, screamed and complained loudly, and Mr. Sanchez otherwise demonstrated in visibly obvious ways, that Mr. SANCHEZ was having a deadly medical emergency, OPERATIONAL LT. SHIVERS, BOP JOHN DOE SUPERVISOR 1, BOP JOHN DOE SUPERVISOR 2, and JOHN/JANE DOES Nos. 1-10 failed to "inform heal[t]h services unit via the unit officer" when Mr. SANCHEZ did "not get better."

211.    Although, as seen above, between March 13-15, 2015, Mr. SANCHEZ, and others, screamed and complained loudly, and Mr. Sanchez otherwise demonstrated in visibly obvious ways, that Mr. SANCHEZ was having a deadly medical emergency, OPERATIONAL LT. SHIVERS, BOP JOHN DOE SUPERVISOR 1, BOP JOHN DOE SUPERVISOR 2, and JOHN/JANE DOES Nos. 1-10 failed to take any steps to provide Mr. Sanchez with access to medical attention.

212.    The acts and omissions of Defendants described more fully above were outside of the scope of "medical or related functions" as defined in 42 U.S.C. § 233(a).

The acts and omissions of Defendants BUSSANICH, BEAUDOUIN, MITCHELL, JOAQUIN, and DOE M.D. described more fully above in failing to examine, diagnose, and/or treat Plaintiffs' decedent were so far below acceptable standards of care that Defendants could not have been making truly medical judgments.

213.    Defendants violated clearly established law by failing to provide treatment for, or access to treatment for, Plaintiffs' decedent's serious medical condition.

214.    As a direct, legal and proximate result of the foregoing, Plaintiffs' decedent Mr. SANCHEZ was injured and damaged, suffered physical injuries, excruciating pain and suffering, conscious pain and suffering, fear of death, mental distress, fear, anxiety, and discomfort, frustration and loss of quality of life, and died, suffering the loss of enjoyment and pleasures of life occasioned by his death, as well as wrongful death and attendant losses, including, but not limited to, loss of future earnings and benefits.


## JURY DEMAND

215.    Plaintiffs demand a trial by jury in this action as to their *Bivens* claims.


## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for the following relief:

A.      Compensatory damages as to all Defendants;

B.      Punitive damages against the individual Defendants;

C.      Reasonable attorneys' fees and costs as to all Defendants;

D.      Such other and further relief as the Court deems just and proper.

Dated:      Brooklyn, New York
              March 6, 2018

                                  Respectfully submitted,

                                  _____
                                  Gideon Orion Oliver
                                  277 Broadway, Suite 1501
                                  New York, NY  10007
                                  (646) 263-3495

                                         /S/

                                  _____
                                  Elena L. Cohen
                                  365 Fifth Avenue, Room 5202
                                  New York, NY  10016
                                  (347) 365-9454

                                  *Counsel for Plaintiffs*