UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
KENNETH MARK BURTON as the Administrator of the
Estate of FRANKLIN RAMOS SANCHEZ, MAGDA
LILIANA SANCHEZ ACOSTA, Individually and as the
m/n/g of F.N.R.M., an Infant, and FRANCY TATIANA
RAMOS SANCHEZ,

            Plaintiffs,

-against-

UNITED STATES OF AMERICA, ANTHONY
BUSSANICH, M.D., ROBERT BEAUDOUIN, M.D.,
YSMAEL JOAQUIN, MLP, NURSE TERRANCE
THOMAS, OPERATIONS LIEUTENANT KIMBERLY
SHIVERS, OPERATIONS LIEUTENANT LORENZO
BARRAZA, HOUSING UNIT OFFICER QUENTIN
HOLZENDORF, HOUSING UNIT OFFICER GERALD
CASTILLO, HOUSING UNIT OFFICER SHAADIQ
SHAKIR, HOUSING UNIT OFFICER ROSALIND
SILVIA, SENIOR OFFICER WILSON SILVA, BOP
JOHN DOE SUPERVISOR 1, BOP JOHN DOE
SUPERVISOR 2, and JOHN/JANE DOES Nos. 1-5,

            Defendants.
------------------------------------------------------------------X

No. 18-cv- 2039 (JHR)(SDA)

## DECLARATION OF ELENA L. COHEN IN SUPPORT OF PLAINTIFF'S PETITION FOR A COMPROMISE ORDER

  ELENA L. COHEN, an attorney duly admitted to practice before this Court, declares the following is true and correct under penalty of perjury pursuant to 28 U.S.C. § 1746:

  1. I am a Principal at Cohen Green PLLC. Along with Gideon Orion Oliver, Esq., I represent the Plaintiff in the above- captioned action.

  2. I am well-familiar with these proceedings, and I submit this declaration in support of Plaintiffs' petition for a Compromise Order.

1

3. The Court is familiar with the facts of this case, which involves claims under the Federal Tort Claims Act ("FTCA") and *Bivens v. Six Unknown Named Agents*, 304 US 388 (1971), based on the death of Franklin Ramos Sanchez in United States custody.

4. The United States has now offered to settle the FTCA claim for $1,999,999.00, with an agreement to dismiss all other claims in this matter.

5. Notably, the offer follows a settlement conference among the parties before United States Magistrate Judge Stewart D. Aaron.

6. Based on verdicts and settlements in similar matters, and the facts of this case, we respectfully submit that this offer is a fair and adequate settlement for plaintiffs' claims. *See*, *e.g.*, Jerome Murdough settlement ($2,250,000 settlement with the New York City comptroller's Office on behalf of Jerome Murdough who died of hyperthermia in a Rikers cell. https://www.nytimes.com/2014/11/01/nyregion/settlement-for-family-of-rikers-inmate-who-died-in-overheated-cell.html); *Conforti, et al. v. County of Ocean*, et al.**,** No. L-2340-15 (Superior Court, New Jersey) (jury verdict of $1,500,000 for man who was not given medication for alcohol withdrawal while in custody and died by suicide). While there are certainly cases with higher verdicts and settlements, there are also cases with lower verdicts and settlements. Indeed, we are aware of numerous wrongful death settlements in the Southern District of New York that were lower than the United States' offer of settlement here. *See*, *e.g.*, *Woods v. City of New York*, No. 15 Civ. 1542 (S.D.N.Y. 2016) ($1.5 million settlement) and *Banks v. Yokemick*, 177 F. Supp. 2d 239 (S.D.N.Y. 2001) (affirming jury verdict of $500,000 for decedent's loss-of-life damages under § 1983).

7. In this case, Mr. Sanchez had limited income and accordingly, the available wrongful death damages under New York state law, which only allows recovery for "pecuniary

loss," were limited. This was especially true as Mr. Sanchez lived and worked in rural Colombia before he was extradited to the U.S., making significantly less money in U.S. dollars than most U.S.-based wage earners do, so his pecuniary losses are lower than they would otherwise be. Additionally, proving any pecuniary loss for Mr. Sachez would have been difficult because he worked in farming and records of wages for people in his profession in Colombia often do not exist at all, let alone in ways that would be admissible as evidence in United States courts.

8. As such, while we are confident in the merits of this case, the settlement offer is fair, and resolving plaintiffs' claims now for $1,999,999 would avoid the risks, uncertainties, and delays inherent in trial and any potential related appeal(s).

9. It is necessary for the Court to issue a compromise order that authorizes Mr. Burton to accept this settlement because the Letters of Limited Administration that the New York County Surrogate issued to Mr. Burton are limited pursuant to New York Surrogate's Court Procedure Act ("S.C.P.A.") § 702(1), which provides:

> Letters may be granted limiting and restricting the powers and rights of the holder thereof: To the enforcement or prosecution of a cause of action in favor of the decedent or his fiduciary under general or special provisions of law, to the defense of any claim or cause of action against a decedent or his fiduciary, and <u>restraining the fiduciary from compromise of the action</u> or the enforcement of a judgment recovered therein <u>until the further order of the court</u> and the filing of satisfactory security if required.

S.C.P.A. § 702(1) (emphasis added).

10. This Court has jurisdiction to issue a compromise order and authorize Mr. Burton to accept the United States' settlement offer. Section 5-4.6 of the New York Estates, Powers, and Trusts Law ("E.P.T.L.") expressly authorizes "[t]he court in which an action for [wrongful death] of a decedent is pending" to issue a compromise order.

3

11. In *Pollicina v. Misericordia Hosp. Med. Cntr.*, 82 N.Y.2d 332 (1993), the New York Court of Appeals, while not specifically addressing letters of administration limited by S.C.P.A. § 702(1), held that, "[w]here the action is pending in a Federal District Court, that court has jurisdiction concurrent with that of the Surrogate's Court." *Id.* at 338 n.2 (citing Rohan, Practice Commentary, McKinney's Cons. Laws of N.Y., Book 17B, E.P.T.L. § 5-4.6, at 595-596 (quoting *Matter of Franco*, 108 Misc. 2d 1084, 1087-1089)).

12. The Second Circuit has expressly recognized this point. *See Moser v. Pollin*, 294 F.3d 335, 341 (2d Cir. 2002) ("In New York, the Surrogate's Courts share concurrent subject matter jurisdiction with the state's court of general jurisdiction, the Supreme Court. There thus exists no probate jurisdiction belonging exclusively to the Surrogate's Court for the District Court improperly to usurp." (citations omitted) (citing N.Y. Const. art. VI, §§ 7, 12; *Pollicina*, 82 N.Y.2d at 339).

13. *Pollicina* also noted that "[t]he suggestion that the Surrogate has a mandatory role to play in the settlement of wrongful death actions has no support in EPTL 5-4.6" because "that statute clearly and unequivocally confers the power of approval upon 'the court in which [the] action for [wrongful death] … is pending.'" 82 N.Y. at 337-38; *see also id.* at 338 ("It is difficult to imagine a clearer expression of the Legislature's intention to leave the power to approve settlements in the hands of the court in which the wrongful death action is pending, in this case the Supreme Court.").

14. Trial courts have recognized and applied *Pollicina*'s holdings. In *Gurbuzturk v. Jamrom*, No. 805284/2013, 2018 N.Y. Misc. LEXIS 1710 (N.Y. Cnty. Sup. Ct. May 10, 2018), the New York Supreme Court, which had overseen the plaintiffs' wrongful death claim, held that it could issue a compromise order even though the letters of administration issued to the plaintiff by

4

the surrogate's court provided: "These letters issued with power to prosecute only and not with power to collect or compromise or exercise any other powers until the further order of this court, or the order of any court of competent jurisdiction." 2018 N.Y. Misc. LEXIS 1710, at *4 (citing E.P.T.L. § 5-4.6). The court concluded it could still issue a compromise order.

15. Thus, this Court, acting pursuant to its exercise of supplemental jurisdiction under 28 U.S.C. § 1367, has authority, just as the New York State Supreme Court would have, to enter a compromise order.

16. Given the extensive work that my firm and Mr. Oliver have performed, which brought about this significant settlement, we ask the Court to award our firms our costs of $50,616.75 and an attorneys' fee of one-quarter of the settlement after costs, consistent with our retainer agreement with the plaintiffs in this matter.

17. The fee of one-quarter of the settlement after costs are deducted amounts to $487,345.56.

18. As such, we ask that the Court award our firms a total of $537,962.31 as for attorneys' costs and fees.

19. Our firms aggressively litigated this case for almost ten years, beginning just after Mr. Sanchez's death ten years ago.

20. Shortly after Mr. Sanchez passed away in 2015, we spoke with his family about pursuing this cause of action. Because Mr. Sachez and his family resided in Colombia, and he died without a will, we successfully petitioned for the Surrogate's Court to grant an administration here in New York, where he passed away.

21. We also immediately began investigating, including interviewing inmate witnesses and requesting and obtaining documents from the United States and elsewhere.

5

22. We then timely filed an FTCA claim with the United States.

23. Because the United States was still considering the FTCA claim at the expiration of the New York State statute of limitations for bringing wrongful death and medical malpractice claims, we also timely filed litigation in New York State Supreme Court raising those claims.

24. When the United States did not respond to the FTCA claim with the statutory time, we then voluntarily dismissed the Supreme Court case and filed litigation in the United States District Court for the Southern District of New York.

25. Mr. Sanchez was housed in an open dormitory at the time of his death with approximately 26 other pre-trial inmates in federal custody. During the course of the litigation, we hired an Investigator to meet with the inmates in custody who by that time were spread out across the country. We also hired an Investigator to speak with witnesses who had since been released from custody, some of whom he interviewed in person and some of whom he interviewed remotely. We then arranged depositions for witnesses in custody, which was extremely hard to do during the height of the COVID-19 pandemic. Ultimately, we were able to depose four witnesses in custody who we believe corroborated key facts to support plaintiffs' claims, and obtained a declaration that also did so from a witness who was by then out of custody. Nearly all of these witnesses only spoke Spanish, and each step of these efforts required us to engage the services of expert Interpreters.

26. All told, we deposed twenty one 30(b)(1) and 30(b)(6) witnesses in this matter, and defended the depositions of Mr. Sanchez two children and his wife (who was deposed twice).

27. One person in custody with Mr. Sanchez who we had spoken to early on and wrote us a letter about the situation leading to Mr. Sanchez's death was deported to Mexico upon his release from custody. In order to subpoena his testimony, we had to go through the Hague Convention process, receiving an order from the Court that we served, and which we were in the

6

process of at the time of the proposed settlement. Again, all of this was in Spanish and required certified translations that we arranged and paid for.

28. There was extensive discovery in this case – both from the government and also from Mr. Sanchez's family, who had made contemporaneous notes and had other discovery relevant to pecuniary damages - that required our review.

29. We were also involved in several discovery disputes, which were resolved only after many meet and confers and ultimately frequent Court intervention.

30. We also had a spoliation issue raised with defendants and the Court, because certain video, e-mails and phone recordings were not preserved.

31. The government filed a motion to dismiss the *Bivens* claims, which we opposed and is fully briefed.

32. We retained Susi Vassallo, M.D. who has qualified as a medical expert in correctional health care in federal district courts in Louisiana, Mississippi, New York, and Texas, and the Fifth Circuit Court of Appeals, among others. She has consulted for the U.S. Department of Homeland Security ("DHS") Division of Civil Rights and Civil Liberties. She is currently the Court-appointed federal medical monitor for medical care in the Orleans Parish Jails consent decree in the U.S. District Court in the Eastern District of Louisiana. We believe that Doctor Vassallo prepared an extremely detailed and powerful seventeen page report that we served on defendants.

33. In short, we expended a tremendous amount of attorney time on this matter, for a one-quarter contingency, which is less than the one-third contingency presumed reasonable in New York.

34. Our firms were retained for a one-quarter contingency fee in this action for the FTCA claims, which is the amount allowable per federal law. *See* 28 U.S.C. § 2678.

35. As the New York Court of Appeals has held, "absent incompetence, deception or overreaching, contingent fee agreements that are not void at the time of inception should be enforced as written." *Matter of Lawrence*, 24 N.Y.3d 320, 339 (N.Y. 2014).

36. The "power to invalidate fee agreements with hindsight should be exercised only with great caution" because it is not "unconscionable for an attorney to recover much more than he or she could possibly have earned at an hourly rate." *Id.* "It is in the nature of a contingency fee that a lawyer, through skill or luck (or some combination thereof), may achieve a very favorable result in short order; conversely, the lawyer may put in many years of work for no or a modest reward." *Id.*

37. Over the years, several different attorneys spent hundreds of hours conducting discovery and engaging in motion practice. As such, we have collectively invested thousands of hours of attorney and legal worker time, as well as significant costs, such that the total bill for our work in the case would exceed the award we are requesting.

38. And, as explained above, ultimately, we believe that counsel achieved a very favorable result in connection with the settlement conference before Magistrate Judge Aaron, after substantial work.

39. If the Court grants Mr. Sanchez's motion, we will promptly file a petition in the New York County Surrogate's Court to determine the appropriate apportionment and distribution of the remaining settlement proceeds.

WHEREFORE, based on the foregoing and all of the pleadings and proceedings had herein, I ask that the Court grant Plaintiffs' petition for a compromise order and issue an order authorizing

9

Mr. Burton to settle his claims for the payment of $1,999,999.00 and discontinue these actions, and fixing the amount of attorneys' fee and costs to Cohen Green PLLC and Gideon Orion Oliver at $537,962.31.

Dated: July 17, 2025  
      New York, NY

                                                Elena L. Cohen